## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**FAUSTINO XAVIER BETANCOURT-COLON,**
     Plaintiff,

     v.

**ARCOS DORADOS PUERTO RICO, LLC, *et al.*,**
     Defendants.

Civil No. 21-1311 (BJM)

### OPINION & ORDER

Faustino Xavier Betancourt-Colon ("Betancourt") sued Arcos Dorados Puerto Rico, LLC ("Arcos Dorados") alleging unlawful discrimination in a place of public accommodation in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (the "ADA" or "the Act"). Docket No. ("Dkt.") 11-1. This court has federal question jurisdiction. This case is before me by consent of the parties. Dkts. 18, 19. A non-jury trial was held on October 23, 2023. Dkt. 87. Following trial, Betancourt moved to amend his complaint to conform to the evidence presented and that motion was granted. Dkts. 88, 97. The parties further submitted post-trial memoranda. Dkts. 99, 101.

For the reasons set forth below, Betancourt's request for a declaratory judgment, injunctive relief, costs, and attorney's fees is **GRANTED IN PART**.

### PROCEDURAL HISTORY

Betancourt sued Arcos Dorados seeking a declaratory judgment that it violated Title III of the ADA, a permanent injunction directing it to comply with the Act, damages, litigation costs, and attorney's fees. Dkt. 11-1. After the parties cross-moved for summary judgment, I granted Arcos Dorados's motion with respect to the area in front of its unisex bathroom's toilet but denied the remainder of its motion. Dkt. 52. Further, I denied Betancourt's motion in its entirety. *Id.* The parties subsequently submitted a joint proposed pretrial order. Dkt. 63.

The matter was tried on October 23, 2023. Dkt. 87. Betancourt testified on his own behalf. He also elicited testimony from an engineer who evaluated the Luquillo McDonald's, Emilio Javier Solís-San Miguel ("Solís"), a maintenance and equipment manager at the Luquillo McDonald's, Jorge G. Furtado Arroyo ("Furtado"), and an attorney for Arcos Dorados, Lorelly Marcano Reyes ("Marcano"). Arcos Dorados elicited testimony from Solís and Marcano. Both Betancourt and Arcos Dorados submitted exhibits into evidence.

At the close of Betancourt's evidence, Arcos Dorados moved to dismiss under Fed. R. Civ. P. Rule 52 claiming Betancourt failed to establish the Luquillo McDonald's violated the ADA and, even if he did, his claims were moot because the facility currently complied with the Act. It renewed this motion after presenting its own evidence and following Betancourt's rebuttal. I deferred ruling on this motion. Following trial, Betancourt filed an amended complaint seeking declaratory relief, injunctive relief, attorney's fees, and costs. Dkt. 88.

## APPLICABLE LEGAL STANDARDS

Congress passed the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title III of the Act "prohibits discrimination against the disabled in the full and equal enjoyment of public accommodations." *Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 128 (2005). To establish a prima facie case pursuant to Title III, a plaintiff "must demonstrate that (1) he or she has a qualified disability under the ADA, (2) the defendant operates a place of public accommodation, and (3) the plaintiff was discriminated against as a result of his or her disability." *Medina-Rodriguez v. Fernandez Bakery, Inc.*, 255 F. Supp. 3d 334, 341 (D.P.R. 2017) (collecting cases).

An ADA plaintiff must first establish standing to bring a claim before this court. "The necessity to establish constitutional standing is rooted in the case or controversy requirement of the Constitution." *Mangual v. Rotger-Sabat*, 317 F.3d 45, 56 (1st Cir. 2003); *see* U.S. CONST. art. III, § 2. "[T]he standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975) (quoting *Baker v. Carr,* 369 U.S. 186, 204 (1962)).

To obtain standing, a plaintiff "must show that (1) he or she personally has suffered some actual or threatened injury as a result of the challenged conduct; (2) the injury can be fairly traced to that conduct; and (3) the injury likely will be redressed by a favorable decision from the court." *New Hampshire Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8, 13 (1st Cir. 1996); *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). "In the context of Title III of the ADA, a plaintiff generally must 'show a real and immediate threat that a particular (illegal) barrier will cause future harm.'" *Disabled Americans For Equal Access, Inc. v. Ferries Del Caribe, Inc.*, 405 F.3d 60, 64 (1st Cir. 2005) (quoting *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 305 (1st Cir. 2003)). "[A] plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000). The evidence relevant to the standing inquiry consists of the facts as they existed at the time the plaintiff filed the complaint. *Moeller v. Taco Bell Corp.*, 816 F. Supp. 2d 831, 849 (N.D. Cal. 2011); *see, e.g.*, *Lujan*, 504 U.S. at 569 n.4.

Once standing is established, an ADA plaintiff must show that discrimination occurred. Disability discrimination includes "a failure to remove architectural barriers, and communication barriers that are structural in nature" 42 U.S.C. § 12182(b)(2)(A)(iv). Generally, public

accommodations built for first occupancy after January 26, 1993 ("new construction") discriminate against individuals with disabilities if they are not "readily accessible to and usable by" such individuals. 42 U.S.C. § 12183(a)(1); *United States v. Hoyts Cinemas Corp.*, 380 F.3d 558, 561 n.2 (1st Cir. 2004). A facility is "readily accessible" where "it can be approached, entered, and used by individuals with disabilities . . . easily and conveniently." 28 C.F.R. pt. 36 app. C § 36.401. This standard "contemplates a high degree of convenient access." *Id*. § 36.310. New construction generally must comply with the standards for accessible design promulgated by the Attorney General of the United States. 28 C.F.R. 36.406(a).

Requirements governing "new construction" are stricter than those governing "existing facilities." *See Am. Ass'n of People with Disabilities v. Harris*, 647 F.3d 1093, 1101 (11th Cir. 2011) ("Generally stated, existing facilities need not provide as extensive access as new/altered facilities must provide."); *Twede v. Univ. of Washington*, 309 F. Supp. 3d 886, 900 (W.D. Wash. 2018) ("The overall policy of the ADA is to require relatively few changes to existing buildings, but to impose extensive design requirements when buildings are modified or replaced.") (internal citations and quotations omitted). Thus, a facility that already existed when the ADA was enacted must only remove "architectural barriers" where doing so is "readily achievable." *See* 42 U.S.C. § 12182(b)(2)(A)(iv). In contrast, new construction must comply with the Attorney General's design standards unless an entity can demonstrate that compliance is "structurally impracticable." 42 U.S.C. § 12183(a)(1); *Hoyts Cinemas Corp.*, 380 F.3d at 561 n.2. "Full compliance will be considered structurally impracticable only in those rare circumstances when the unique characteristics of terrain prevent the incorporation of accessibility features." 28 C.F.R. § 36.401(c)(1).

If an ADA plaintiff establishes that discrimination occurred, the claim may nevertheless be moot. "The doctrine of mootness enforces the mandate 'that an actual controversy must be extant at all stages of the review, not merely at the time the complaint is filed.'" *Mangual*, 317 F.3d at 60 (quoting *Steffel v. Thompson*, 415 U.S. 452, 460 n.10 (1974)). "A case is moot when the issues are no longer live or the parties no longer have a legally cognizable interest in the outcome." *Horizon Bank & Tr. Co. v. Massachusetts*, 391 F.3d 48, 53 (1st Cir. 2004). "[A] case not moot at the outset can become moot because of a change in the fact situation underlying the dispute, making relief now pointless." *Id*. "If events have transpired to render a court opinion merely advisory, Article III considerations require dismissal of the case." *Mangual*, 317 F.3d at 60.

However, "[t]he burden of establishing mootness rests squarely on the party raising it, and '[t]he burden is a heavy one.'" *Id*. (quoting *United States v. W.T. Grant Co.,* 345 U.S. 629, 633 (1953)) (alteration in original). "It must be 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Id*. (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)); see also *Friends of the Earth, Inc.*, 528 U.S. at 170.

## FINDINGS OF FACT

The following facts are taken from testimony and exhibits received at the October 23, 2023 trial. The parties agreed Betancourt satisfied the first two prongs of the ADA inquiry because he has a disability and the Luquillo McDonald's is a public accommodation. Betancourt testified he has a disability within the ADA's definition, which Arcos Dorados did not contest. Dkt. 94 (Trial Transcript) at 59:17–60:15. Specifically, Betancourt suffers from heart failure, retaining just 17 % heart function, and deformities in his lower extremities. *Id.* at 60:23–61:2. As a result, he uses a pacemaker and a defibrillator. *Id.* at 61:3–4. Further, he is unable to walk long stretches, sometimes needs help bathing, and sometimes loses his balance. *Id.* at 61:5–8. He uses a wheelchair and

walker and has held a handicap parking permit issued by the Commonwealth of Puerto Rico since at least 2020. *Id.* at 61:21–62:6. Regarding the second element of the inquiry, Arcos Dorados conceded both that the Luquillo McDonald's qualified as a public accommodation and that it operated the facility. *Id.* at 105:14–22; 177:13–16.

Betancourt frequently travels to Luquillo, Puerto Rico because his brother lives just a short drive from the town's McDonald's. *Id.* at 62:10–63:2. Betancourt has visited the Luquillo McDonald's several times, including on April 24, 2021. *Id.* at 63:7–18. That day, his experience was "somewhat uncomfortable because the[] facilities were not adapted to [his] needs." *Id.* at 63:21–22. Specifically, he believed the handicap parking spaces were too narrow, *id.* at 64:9–11, the restaurant's checkout counter was too high, *id.* at 68:14–69:1, the grab bars in the restroom were improperly located, *id.* at 70:22–71:3, a trash can obstructed access to the toilet, *id.* at 72:16–23, and the mirror above the sink was too high. *Id.* at 72:24–73:13. Nevertheless, Betancourt would like to return to the Luquillo McDonald's because he likes the food sold there and it is near his brother's home. *Id.* at 63:3–6; 74:25–75:6. I note that, on cross examination, Betancourt acknowledged he had downloaded the McDonald's smartphone application, which he used to obtain discounts and promotions, but not order food. *Id.* at 87:20–88:5.

After receiving Betancourt's complaint, Arcos Dorados hired Emilio J. Solís-San Miguel ("Solís") to evaluate whether the Luquillo McDonald's complied with the ADA. *Id.* at 6:20–7:12. Solís visited the Luquillo McDonald's three times: on December 2, 2021, March 16, 2022, and March 24, 2022. *Id.* at 18:13–19. He said he was told the facility was constructed in 1994 or 1995. *Id.* at 33:17–22. Arcos Dorados's attorney, Marcano, similarly testified that the facility was built and has been operating since 1995. *Id.* at 179:2–14. On Solís's first visit, he measured the aisles adjoining the accessible parking spaces and found these aisles measured less than five feet wide.

*Id.* at 10:15–22. He then measured the counter where patrons pay for and receive food, which he found was 37 inches high. *Id.* at 11:8–11; 12:8–25. He further found the bathroom grab bars next to the toilet and the sink were 37 inches high. *Id.* at 15:17–16:10. Below the bathroom sink, he noted exposed plumbing. *Id.* at 16:13–17. Above the sink, he observed a mirror was installed such that the bottom of it measured more than 40 inches from the floor. *Id.* at 16:18–17:8. He also noted a cylindrical trash can was in the corner of the bathroom across from the toilet. *Id.* at 17:9–17.

Solís later testified as an expert witness in ADA compliance and civil engineering. *Id.* at 141:18–142:14. As in his initial testimony, he noted there were two parking spaces marked accessible when he first visited the Luquillo McDonald's. *Id.* at 148:3–7. However, he found their dimensions did not meet the ADA's requirements. *Id.* at 150:2–11. By his second visit, the accessible parking area had been reconfigured to create one ADA-compliant accessible parking space. *Id.* at 148:8–20. Solís explained that, given the number of parking spaces at the Luquillo McDonald's, the ADA required only one van-accessible parking space. *Id.* at 149:18–150:11. Solís further testified that the ramp connecting the accessible parking space to the Luquillo McDonald's entrance complied with the ADA's width and slope requirements. *Id.* at 151:13–25. And by Solís's third visit, the Luquillo McDonald's had added a sign designating the parking space as van accessible. *Id.* at 156:2–11. Thus, Solís concluded that while the accessible parking area at the Luquillo McDonald's originally failed to comply with the ADA, the newly reconfigured area, including the parking space, aisle, and ramp, satisfied the ADA's requirements. *Id.* at 154:14–24.

Turning to the inside of the restaurant, Solís testified that the checkout counter was never lowered from its 37-inch height because it complied with the ADA's 38-inch height limit for such counters. *Id.* at 11:8–11; 12:8–25; 158:16–159:13. He testified the grab bar beside the toilet was originally too high, but was subsequently lowered to comply with the ADA's requirement that it

be no more than 36 inches from the floor. *Id.* at 169:2–18. He further testified the floor space adjoining the bathroom toilet was sufficient and the ADA allowed for a trash can to be located within that space. *Id.* at 168:12–169:1. And though he stated the newly lowered bathroom sink complied with the ADA, he did not address whether the mirror hanging above it did. *Id.* at 170:17–19.

Solís concluded his testimony noting that Arcos Dorados is currently renovating the Luquillo McDonald's in accordance with the ADA and stating that he believed Arcos Dorados began this project on its own volition. *Id.* at 170:20–172:22. Further, Arcos Dorados's attorney, Marcano, testified that the company had spent approximately $350,000 on renovations, *id.* at 189:19–190:2, which it expects to complete in December 2023. *Id.* at 195:10–24. And, both she and Hurtado testified Arcos Dorados has no financial limitations preventing it from bringing its restaurants into compliance with the ADA. *Id.* at 53:3–24; 58:7–13.

In rebuttal, Betancourt testified he visited the Luquillo McDonald's on October 20, 2023. *Id.* at 198:4–6. That day, he observed the accessible parking area was obstructed by construction materials, the bathroom mirror measured 43 inches from the floor, and the grab bar was located 13 inches from the wall. *Id.* at 199:25–202:20.

## DISCUSSION

### I.    Motion to Amend Complaint

Arcos Dorados contests Betancourt's motion to amend his complaint to conform to evidence presented at trial. Dkt. 99 at 3–8. However, unless ordered otherwise, parties must respond to a motion within 14 days of service and failure to do so results in that party's waiver of any objection. Local Rule 7(b). Accordingly, after Arcos Dorados failed to timely respond to Betancourt's motion, I granted it as unopposed. Dkt. 97. Moreover, even if Arcos Dorados's

opposition were timely, its arguments are unavailing. First, it argues Betancourt's motion was untimely. Dkt. 99 at 5–6. However, "[a] party may move--at any time, even after judgment--to amend the pleadings to conform them to the evidence and to raise an unpleaded issue." Fed. R. Civ. P. 15(b)(2). Next, Arcos Dorados argues Betancourt's amended complaint improperly included allegations regarding October 2023 ADA violations. Dkt. 99 at 5–6. However, Arcos Dorados argued at trial that Betancourt's ADA claims were moot because it had removed various barriers. And Betancourt rebutted that contention with evidence of October 2023 ADA violations. Because the parties litigated this issue, Betancourt could amend his complaint accordingly. Fed. R. Civ. P. 15(b)(2). Lastly, Arcos Dorados argues Betancourt's motion to amend his complaint is futile because the Luquillo McDonald's always complied with the ADA and because the amended complaint would place Betancourt's claim outside of the one-year statute of limitations for ADA claims. Dkt. 99 at 5, 7–8. As discussed below, the first contention is incorrect even according to Arcos Dorados's own expert witness. As for the statute of limitations issue, Betancourt first visited the Luquillo McDonald's in April 2021. Dkt. 94 at 63:17–18. And he filed his first amended complaint in August of that year at which point the statute of limitations was tolled. *See* Dkt. 11-1; 31 L.P.R.A. § 9489. Accordingly, I turn to the alleged ADA violations.

## II. Prima Facie Claim

The first question is whether Betancourt established a prima facie case of ADA violations. As discussed, the parties concede Betancourt satisfies the first two elements of a prima facie ADA claim because he is disabled and the Luquillo McDonald's is a public accommodation. *See Medina-Rodriguez*, 255 F. Supp. 3d at 341 (collecting cases); Dkt. 94 at 59:17–60:15; 105:14–22; 177:13–16. Thus, the only question is whether Arcos Dorados discriminated against Betancourt due to his disability.

Disability discrimination includes "a failure to remove architectural barriers, and communication barriers that are structural in nature" 42 U.S.C. § 12182(b)(2)(A)(iv). Depending on a facility's date of construction, either the 1991 or 2010 ADA Guidelines apply. *See* 28 C.F.R. § 36.406(a). Here, the parties stipulated that the 2010 ADA Guidelines apply. Dkt. 94 at 101:18–102:11. Betancourt contends he faced discriminatory barriers in the McDonald's parking lot, service counter, and bathroom.

### A.      The Parking Lot

### 1. Barriers

Betancourt presented evidence of possible ADA violations in the parking lot with respect to the parking spaces, the access aisles, and the ramps. I will discuss each of these below. To begin however, I note Arcos Dorados complains that Betancourt failed to submit evidence any areas violated the Act because he offered no expert testimony and did not personally measure the various alleged barriers. Dkt. 99 at 26–28. Neither argument is convincing.

Regarding experts, there is no requirement that ADA plaintiffs use expert testimony nor that experts measure alleged ADA violations. As this court has previously observed, "a lay witness 'may estimate size, weight, distance, speed and time even when those quantities could be measured precisely.'" *Medina Rodriguez v. Canovanas Plaza Rial Econo Rial, LLC*, 2019 WL 5448538, at *10 (D.P.R. Oct. 23, 2019), *judgment clarified sub nom. Medina v. Canovanas Plaza Rial*, 2020 WL 12442283 (D.P.R. Jan. 3, 2020). Because actual measurements would presumably produce even more reliable testimony than estimates, it follows that a lay witness could similarly measure the distances constituting the alleged ADA violation at issue here.

Moreover, contrary to Arcos Dorados's contention that Betancourt failed to personally measure areas of the Luquillo McDonald's, Betancourt submitted photos of himself doing just that.

Pl. Exs. 12, 16–17. Further, Arcos Dorados cites no authority that an ADA plaintiff must measure facilities himself. And because ADA plaintiffs are disabled, requiring them to personally measure facilities allegedly inaccessible to disabled individuals would be illogical at best and insulting at worst. Accordingly, neither Betancourt's omission of expert testimony nor his failure to personally measure the barriers he identified warrants dismissing his claim. I now turn to the specifics of the Luquillo McDonald's parking lot.

### i.     *Parking spaces*

Betancourt contends the accessible parking spaces were narrower than the dimensions allowed by the ADA. Dkt. 88 at ¶ 9(a). He also contends they lacked required signs. *Id.* at ¶ 9(c). The Luquillo McDonald's undisputedly provides parking and thus must provide at least one accessible parking space. *See* ADA Accessibility Guidelines ("ADAAG") § 208.1 ("Where parking spaces are provided, parking spaces shall be provided in accordance with [ADAAG §] 208."). At facilities with one to twenty-five parking spaces, at least one space must be accessible. ADAAG § 208.2. Additionally, "[a]t least one accessible route shall be provided within the site from accessible parking spaces . . . to the accessible building or facility entrance they serve." ADAAG § 206.2.1.

To determine whether Betancourt alleged a prima facie ADA claim, I examine the state of the parking lot at the time of his initial visit in April 2021. *See Moeller*, 816 F. Supp. at 849. Arcos Dorados's expert witness, Emilio Solís, testified the ADA Guidelines required accessible parking spaces to measure eleven feet wide with a five-foot-wide adjoining access aisle or eight feet wide with an eight-foot-wide adjoining access aisle. Dkt. 94 at 150:2–11; *see also* ADAAG § 502.2. He then noted the dimensions of the disabled parking spaces did not comply with the ADA as of his first visit to the Luquillo McDonald's in December 2021. Dkt. 94 at 150:2–11; 154:19–155:2. He

also stated the spaces lacked required signs. *Id.* at 150:2–11; 153:2–9. Given these deficiencies, Betancourt successfully stated a prima facie claim that the accessible parking spaces violated the ADA as of his initial visit.

### ii.    Access Aisles

Betancourt also alleges the two aisles connecting the accessible parking spaces at the Luquillo McDonald's violated the ADA. In particular, he contends the aisles were too narrow, one aisle featured an unauthorized change in level, and the other did not lead to a ramp connecting to the restaurant's accessible entrance. Dkt. 88 ¶ 9(b), (d). As discussed, access aisles must measure at least five feet wide. ADAAG § 502.2. And changes in level are not permitted. ADAAG § 502.4. Further, aside from the ramp slope and cross slope, changes in level are not permitted on ramps either. *Id.* § 405.4. Additionally, access aisles must adjoin an accessible route. *Id.* § 502.3. Solís stated that, as of December 2021, the access aisles were less than five feet wide and, while testifying as Arcos Dorados's expert witness, concluded the aisles were thus too narrow to meet ADA Guidelines. Dkt. 94 at 10:15–22; 154:14–155:2. He also repeatedly corroborated Betancourt's allegation that there was a change in level, essentially a curb, between one of the access aisles and the sidewalk. *Id.* at 10:23–25; 21:3–8. He further stated that one, not both, of the access aisles connected to a ramp leading to the restaurant's main entrance. *Id.* at 21:9–12. Accordingly, Betancourt stated a prima facie claim that the access aisles violated the ADA because they were too narrow, one featured a curb, and the other did not connect to an accessible entrance.

### iii.    Ramp – Change in Level

Betancourt next argues the ramp connecting the access aisle to the Luquillo McDonald's entrance featured a potentially hazardous bump and the only alternative route required maneuvering dangerously close to the edge of the curb. Dkt. 101 at 11. However, he included no

allegations addressing a bump in his original complaint where he alleged the ramp was too steep and too narrow. Dkt. 11-1 at 11 ¶ (l)–(m). And his amended complaint, which alleges the ramp lacks side flares or a comparable warning, does not mention the hazardous bump or the dangerous alternative route. Dkt. 88-1 at 12 ¶ (e). Nevertheless, the parties' pretrial order indicated they disputed whether the ramp violated the ADA because it featured a bump at its base and it was too steep and too narrow. Dkt. 63 at 17–18, 32. And "the inclusion of a claim in the pretrial order is deemed to amend any previous pleadings that did not include that claim." *Morales-Figueroa v. Valdes*, 2019 WL 13200032, at *2 (D.P.R. July 9, 2019) (quoting *Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002)). The parties subsequently litigated these issues at trial. Accordingly, though Betancourt's amended complaint filed after trial did not discuss the ramp's bump, slope, or width, I must treat these issues as though they were raised in his complaint. Fed. R. Civ. P. 15(b)(2). Thus, I examine Betancourt's claims regarding the ramp's bump, slope, width, and lack of side flares.

Changes in level on ramp landings are not permitted. ADAAG § 405.7.1. And Solís admitted the base of the ramp was uneven as of his initial visit. Dkt. 94 at 152:1–14. Thus, Betancourt stated a prima facie claim there was a change in level at the base of the ramp in violation of ADAAG § 405.7.1.

### iv.    *Ramp – Slope and Width*

Ramp runs must have a slope no steeper than 1:12, ADAAG § 405.2, and surfaces running perpendicular to ramps must be no steeper than 1:48. ADAAG § 405.3. A 1:12 slope means that a ramp rises 1 inch vertically for each 12 inches that it runs horizontally.[1] The ratio can also be determined by measuring the number of degrees by which a slope inclines. A 1:12 slope inclines

---

[1] *Ramp Calculator*, OMNI CALCULATOR, https://www.omnicalculator.com/construction/ramp-slope#how-do-you-calculate-the-slope-of-a-ramp (last visited Dec. 21, 2023).

by 4.76°.[2] A 1:48 slope inclines by 1.19°.[3] Ramps and walking surfaces must be at least 36 inches wide. ADAAG §§ 403.5.1, 405.5. Betancourt offered no measurement or estimate of the ramp's slope and width. Arcos Dorados's expert, Solís, testified the ramp measured fifty-two inches wide. Dkt. 94 at 151:16–21. Accordingly, Betancourt failed to state a prima facie claim with respect to the ramp's slope and width. Thus, his claims regarding these violations are **DISMISSED with prejudice**.

> #### v.      *Ramp – Side Flares*

Betancourt's amended complaint alleges the ramp lacks side flares or any detectable warning. Dkt. 88-1 at 12 ¶ (e). However, this issue appears nowhere in his original complaint or the pretrial order. And it was never litigated at trial. Accordingly, it may not be raised at this late date. *See* Fed. R. Civ. P. 15(b)(2) (providing that parties may amend pleadings post-trial to address issues litigated at trial). Betancourt's claim the ramp lacks side flares or a detectable warning is thus **DISMISSED with prejudice**.

### 2.   **Injury in Fact/Equivalent Facilitation**

Notwithstanding the above, Arcos Dorados argues Betancourt did not suffer an injury in fact because he never attempted to access the restaurant from the street or sidewalk and admitted he always could access it via its drive-thru window. Dkt. 99 at 12. To the extent Arcos Dorados contends Betancourt never alleged he entered the Luquillo McDonald's from the parking lot, it is incorrect. Betancourt testified credibly he could not comfortably exit his vehicle while another vehicle was parked next to it. Dkt. 94 at 64:7–11. Accordingly, he had to endanger himself by using a road to reach the restaurant's entrance. *Id.* at 82:17–21. He also stated the ramp entering the restaurant was narrow. *Id.* at 64:4–6. Betancourt thus offered evidence he experienced issues

---

[2] *Id.*
[3] *Id.*

entering the restaurant due to its parking lot configuration and the ramp connecting that parking lot to the facility's entrance.

To the extent Arcos Dorados argues Betancourt could have used an alternative entrance, its argument is better characterized as a claim that it provided an equivalent facilitation. *See* ADAAG § 103 ("Nothing in these requirements prevents the use of designs, products, or technologies as alternatives to those prescribed, provided they result in substantially equivalent or greater accessibility and usability."). However, Arcos Dorados presented no information regarding the existence of an alternative entrance much less whether it complied with the ADA. Thus, that argument is waived. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work."). And even if Arcos Dorados did not waive this argument, its failure to provide any detail regarding an alternate entrance forecloses any equivalent facilitation claim. *See Advisory to* ADAAG § 103. ("The responsibility for demonstrating equivalent facilitation in the event of a challenge rests with the covered entity.").

Arcos Dorados seemingly makes another equivalent facilitation claim by pointing to its drive-thru. Again, its failure to develop that argument is fatal. Arcos Dorados offers no analysis of whether its drive-thru amounts to an equivalent facilitation. Even if it did, Arcos Dorados's equivalent facilitation argument would fail. A case Arcos Dorados cited in its argument that it provided an equivalent facilitation for the Luquillo McDonald's restaurant counters is instructive. There, this court addressed whether an equivalent facilitation existed where workers at a cafeteria meat counter "t[ook] the orders of both disabled and non-disabled customers over the counter" but "hand[ed] products to non-disabled customers over the counter, and . . . hand[ed] products to disabled customers through a nearby door." *Medina*, 2020 WL 12442283, at *2. I held such an

arrangement was not an equivalent facilitation because it required disabled customers to "conduct transactions in a manner that is materially different than the way in which non-disabled customers conduct transactions." *Id.* The same is true of requiring disabled customers to use a drive-thru while able-bodied customers can obtain service by entering a restaurant. Thus, the presence of a drive-thru does not relieve Arcos Dorados from ADA requirements governing exterior spaces of the Luquillo McDonald's.

In sum, Betancourt successfully stated a prima facie claim regarding the following ADA parking lot violations: (1) the accessible parking spaces were too narrow; (2) the accessible parking spaces lacked required signs; (3) the aisles adjoining the accessible parking spaces were too narrow; (4) one adjoining aisle featured an unauthorized change in level; and (5) the other adjoining aisle did not connect to the accessible entrance.

## B. The Counter

Betancourt alleges a counter inside the Luquillo McDonald's violated the ADA because it was too high. Dkt. 88 at ¶¶ 11–12. Arcos Dorados again argues Betancourt failed to establish an injury in fact because he did not explain how this barrier affected him. Dkt. 99 at 18. It also notes Betancourt testified no employee made discriminatory remarks to him during his visits to the Luquillo McDonald's. *Id.* It further argues the counter's height complies with the ADA and contends Betancourt concedes the point. *Id.* at 16. Even if the counter violates the ADA, Arcos Dorados notes Betancourt admitted he could use the facility's drive-thru and had the McDonald's smartphone app, which patrons can use to place orders. *Id.* at 19.

### 1. Injury in fact

Betancourt established an injury in fact. He testified the counter's height constituted a barrier for him because, while retrieving his items, he struggled to balance and experienced pain

due to carpal tunnel. Dkt. 94 at 68:15–18. Arcos Dorados's argument that no employee made discriminatory remarks to Betancourt is irrelevant and exhibits a fundamental misunderstanding of the ADA. Under the Act, disability discrimination includes "a failure to remove architectural barriers, and communication barriers that are structural in nature." 42 U.S.C. § 12182(b)(2)(A)(iv). Disparaging comments are not required. Thus, I examine whether the counter's height violated the ADA.

### 2.  Barrier

The parties stipulated the counter measures 37 inches high and always has. Dkt. 94 at 113:2–15. However, they disagree over whether this height is ADA-compliant. Arcos Dorados argues it satisfies the ADA's 38-inch height limit for checkout aisles. Dkt. 99 at 16–17 (citing ADAAG § 904.3.2). Betancourt notes the counter is used for making purchases, distributing food, and answering customers' questions regarding menu items. Dkt. 101 at 13–14. Thus, he claims it is a sales and service counter that may be no higher than 36 inches. *Id.*

Arcos Dorados contends Betancourt conceded the counter was a checkout aisle and argues its height complies with regulations governing such aisles. Dkt. 99 at 16. It quotes Betancourt's complaint, which states the Luquillo McDonald's features a checkout aisle that violates the ADA because it is more than 38 inches high. *Id.* (quoting Dkt. 11-1 at 11 ¶ (o)). However, I note the very next paragraph of Betancourt's complaint states sales and service counters in the Luquillo McDonald's violate the ADA because they are more than 36 inches high. *See* Dkt. 11-1 at 11–12 ¶ (p). Betancourt's complaint never clarifies which of these allegations refer to the counter in question. I thus disagree that he classified this counter as a checkout aisle in his complaint. Instead, I find he (haphazardly) placed Arcos Dorados on notice he would argue at least one counter in the Luquillo McDonald's violated the ADA's requirements governing sales and service counters.

Next, I note the parties' joint pretrial order never mentions sales and service counters. In Betancourt's only discussion of aisles and counters in that order, he alleges the checkout aisles lack ADA-compliant signage and the counter lacks adequate space below it for wheelchair users' feet and knees. Dkt. 63 at 21–22. He further explains these barriers require him to position his mobile scooter sideways, which complicates his ability to pay for items. *Id.* at 23–24. This court adopted the parties proposed pretrial order and stated, "[n]o additional claims, defenses, witnesses, or exhibits will be allowed absent a showing of just cause." Dkt. 70 at 1–2. And generally, pretrial orders may be modified following the pretrial conference "only to prevent manifest injustice." Fed. R. Civ. P. 16(e).

Nevertheless, like an issue omitted from the pleadings, an issue omitted from the pretrial order may be tried by implied consent. *Kirkland v. D.C.*, 70 F.3d 629, 634 (D.C. Cir. 1995); *see also Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 515 n. 9 (9th Cir. 1985); *Monod v. Futura, Inc.*, 415 F.2d 1170, 1174 (10th Cir. 1969); *Bucky v. Sebo*, 208 F.2d 304 (2d Cir. 1953). That is because, as discussed, Fed. R. Civ. P. Rule 15(b) explicitly allows amended pleadings to conform to the issues tried by consent. And as the *Kirkland* court explained:

> Any case where it is necessary to amend the pleadings by implied consent under Rule 15(b) to accord with the evidence will presumably also be a case where the issue has been tried in contradiction to the pre-trial order; if the new matter had been included in the pre-trial order, that would control by the force of Rule 16(e).

70 F.3d at 634. Accordingly, if Rule 16(e) required just cause to amend the pretrial order to include issues tried by consent, "Rule 15(b)'s provision for amendment by implicit consent would be a dead letter." *Id.*

Here, by disputing whether the counter was a checkout aisle or a sales and service counter, the parties undisputedly litigated whether its height complied with the ADA. Dkt. 99 at 15–16; Dkt. 101 at 12–15. Notably, Arcos Dorados never argued the pretrial order omitted discussion of

the counter's height. Instead, it erroneously stated the pretrial order mirrored the allegations in his complaint. Dkt. 94 at 130:4–10. Accordingly, the parties tried this issue by consent and Betancourt properly included it in his amended complaint. *See* Dkt. 88-1 at 5 ¶ 11. I thus examine the parties' arguments on this point.

The ADAAG do not define either checkout aisles or sales and service counters. *See* ADAAG § 106. Further, neither party cites authority interpreting when each classification applies. Arcos Dorados presented expert testimony from Solís that the counter complied with the ADA. Dkt. 94 at 159:2–11. But Solís said he classified this area as a checkout counter because the complaint referred to it as such. *Id.* And that contention is incorrect as discussed above. For his part, though Betancourt argued the Luquillo McDonald's counter served multiple purposes, he offered no analysis addressing whether that fact supported finding the counter was a check-out aisle or a sales and service counter. Dkt. 101 at 12–13.

Nevertheless, relevant authority supports Betancourt's argument that the Luquillo McDonald's counter is properly classified as a sales and service counter. The counter contains a cash register and promotional signage. *See* Def. Ex. B at 6–7. Betancourt further testified he bought food, looked at the menu, and asked for and received sauce at the counter. Dkt. 94 at 68:1–69:4. When applying the 1991 ADA regulations to a cafeteria counter where customers received goods and services, this court previously observed that, if the counter had a cash register, it would need to measure no more than 36 inches high. *Medina*, 2020 WL 12442283, at *1 (citing 28 C.F.R. pt. 36 app. D § 7.2(1)) (acknowledging the counter in question did not have a cash register and analyzing it under a different standard). Using the 2010 standards, another court determined a Starbucks counter where cash registers, merchandise and other items were located was a sales counter that must be 36 inches or lower. *Johnson v. Starbucks Corp.*, 2019 WL 699136, at *1–2

(E.D. Cal. Feb. 20, 2019) (citing ADAAG § 904.4); *affirmed by Johnson v. Starbucks Corp.*, 818 F. App'x 657, 659 (9th Cir. 2020). Accordingly, the Luquillo McDonald's counter is a sales and service counter that must measure no higher than 36 inches to comply with the ADA. And because the parties agree the counter measures 37 inches high, Betancourt stated a prima facie case that it fails to do so.

### 3. Equivalent facilitation

As mentioned, Arcos Dorados argues Betancourt did not suffer an injury because he could have ordered food at the Luquillo McDonald's drive-thru. This amounts to the same equivalent facilitation argument I discussed when analyzing the facility's parking lot above. And just as the drive-thru did not relieve Arcos Dorados of its responsibility to ensure the Luquillo McDonald's exterior complied with the ADA, it does not relieve Arcos Dorados of its obligation to ensure the facility's interior counter complies with the ADA.

Similarly, Arcos Dorados argues Betancourt did not suffer an injury because he could have ordered food through the McDonald's app. This amounts to another equivalent facilitation argument. As mentioned, equivalent facilitations must "result in substantially equivalent or greater accessibility and usability." ADAAG § 103. And, "[t]he responsibility for demonstrating equivalent facilitation in the event of a challenge rests with the covered entity." *Advisory to* ADAAG § 103. Citing *California Found. for Indep. Living Centers v. Cnty. of Sacramento*, 142 F. Supp. 3d 1035, 1056 (E.D. Cal. 2015) and this court's equivalent facilitation discussion in *Medina*, 2020 WL 12442283, at *2, Arcos Dorados argues it provides an equivalent facilitation by allowing customers to order through the McDonald's app and sending an employee to deliver food to either parking spaces outside or tables inside the Luquillo McDonald's. Dkt. 99 at 37–38. The *Cnty. of Sacramento* court found an airport failed to establish an equivalent facilitation where it argued

disabled patrons could pass documents around the side of a high counter or gate agents could alternatively walk around the counter to assist them. 142 F. Supp. 3d at 1058. And in *Medina*, this court found handing food to disabled customers at a location near a counter that exceeded the ADA height limit was not an equivalent facilitation. *Medina*, 2020 WL 12442283, at *2. Similarly, where able-bodied patrons can order and pick up food at the counter, I do not see how requiring disabled customers to order food through an app and wait for it at a table results in an equivalent facilitation. Further, Betancourt testified that, in addition to ordering food at the counter, patrons ask for condiments such as barbecue sauce. Dkt. 94 at 68:1–69:4. And Arcos Dorados presented no evidence that patrons could ask for these condiments through the McDonald's app.

Moreover, though I found no court that has examined whether a mobile phone app amounts to an equivalent facilitation, one court previously dismissed a similar argument involving more rudimentary technology. *See Johnson v. Wayside Prop., Inc.*, 41 F. Supp. 3d 973, 979–80 (E.D. Cal. 2014) (finding hardware store counter violated ADA and store's offering of a clipboard to help disabled patrons conduct transactions did not amount to an equivalent facilitation). The *Johnson* court noted the U.S. Department of Justice published an ADA guide stating the use of a clipboard in lieu of lowered counters is permitted only "until more permanent changes can be made." *Id.* at 979 (quoting U.S. Dep't of Justice, ADA Update: A Primer for Small Business 15 (2011)). And it observed that the Ninth Circuit has stated "positions taken by DOJ in technical assistance manuals that purport to interpret the ADAAG are 'entitled to substantial deference' and 'will be disregarded only if plainly erroneous or inconsistent with the regulation.'" *Id.* (quoting *Miller v. Cal. Speedway Corp.,* 536 F.3d 1020, 1028 (9th Cir. 2008)). After finding no indication that the ADAAG or any other regulation contradicted the DOJ's opinion regarding clipboards, the

*Johnson* court found it must defer to the DOJ's view that a clipboard could only be used as a temporary solution and not an equivalent facilitation. *Id.* at 980.

Though a smartphone uses far more advanced technology than a clipboard, I fail to see how the two are functionally distinguishable in this situation. While non-disabled patrons could order food at the counter, Arcos Dorados would require Betancourt to use his smartphone to communicate his order through the McDonald's app where Arcos Dorados employees would receive it. Though this interaction would occur via electronic devices and a wireless internet connection, Betancourt's smartphone and the McDonald's app would effectively serve the same purpose as the clipboard passed between disabled patrons and store employees in *Johnson*. Thus, like the clipboard in *Johnson*, this technology can only be used "until more permanent changes can be made." 41 F. Supp. 3d at 979 (quoting U.S. Dep't of Justice, ADA Update: A Primer for Small Business 15 (2011)).

Arcos Dorados also failed to address various issues raised by its suggestion that disabled customers could order via the McDonald's app. First, it identified no signage informing disabled customers they should go to a table and order via the McDonald's app. *See Moeller*, 816 F. Supp. 2d at 866 (finding fast-food restaurant's auxiliary access requiring disabled customers to line up to the side of its queue was not an equivalent facilitation in part because "[t]here was no evidence indicating that there was signage offering assistance to customers with disabilities"). In the absence of such signage, disabled patrons will presumably go to the counter where they will then face barriers to buying food or interacting with employees. According to his testimony, that is precisely what Betancourt did. I note Solís testified Luquillo McDonald's employees told him there was a policy instructing them to direct disabled patrons to sit at a table. Dkt. 94 at 160:16–24. However, there is no evidence that any Luquillo McDonald's employee instructed Betancourt accordingly.

Thus, Arcos Dorados introduced no evidence that disabled customers knew of or understood that they were to sit at a table and order via the McDonald's app. *See id.* at 866 (finding restaurant "introduced no lay witness testimony from customers who use wheelchairs that they understood or endorsed the separate auxiliary access"). Accordingly, even if a smartphone app could amount to an equivalent facilitation in some cases, it cannot do so where, as here, a facility provides no explanation to disabled customers that they should order via the app nor offers to help them do so.

Further, both the drive-thru and the McDonald's app approaches violate the ADA's integration mandate. *See Moeller*, 816 F. Supp. 2d at 867. That requires public accommodations to provide "[g]oods, services, facilities, privileges, advantages, and accommodations . . . in the most integrated setting appropriate . . .," 42 U.S.C. § 12182(b)(1)(B), and prohibits places of public accommodation from providing people with disabilities with services, facilities, privileges, advantages, or accommodations that are not equal to, or are different or separate from those provided to other individuals. *Id.* § 12182(b)(1)(A)(ii) & (iii). "Providing services in the most integrated setting is a fundamental principle of the ADA." H.R. Rep. 101–485, pt. 2, at 102 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 385. Thus, Arcos Dorados failed to show the drive-thru or McDonald's app are equivalent facilitations under the ADAAG.

### C.  The Bathroom

Betancourt also alleged several barriers in the Luquillo McDonald's bathroom. First, he noted the space around the toilet was obstructed by a metal trash can. Dkt. 88-1 at 14 ¶ 13(a). Next, he alleged both grab bars adjacent to the toilet were too high. *Id.* ¶ 13(b). He further alleged the grab bar on the wall beside the toilet was located too far from the wall adjoining the back of the toilet. *Id.* ¶ 13(c). Lastly, he alleged the bathroom mirror was positioned too high. *Id.* ¶ 13(d). Arcos

Dorados disputes each of Betancourt's contentions and again argues he failed to explain how the alleged barriers affected him.

### 1. Injury in Fact

#### i.    *Trash can*

In his post-trial brief, Betancourt waived this claim as moot. Dkt. 101 at 22. Accordingly, it is **DISMISSED with prejudice.**

#### ii.    *Side Grab Bar – Height*

The Luquillo McDonald's bathroom features two cylindrical, metal grab bars installed on walls adjacent to its toilet. *See* Dkt. 86 at 27–28. Betancourt testified that, as of his initial visit, the bars were far from where they were supposed to be to facilitate his movement from his wheelchair to the toilet. Dkt. 94 at 70:22–71:3. He later clarified the height of the grab bar beside the toilet was appropriate for him. *Id.* at 72:1–15. As mentioned, "[i]n the context of Title III of the ADA, a plaintiff generally must 'show a real and immediate threat that a particular (illegal) barrier will cause future harm.'" *Disabled Americans For Equal Access, Inc.*, 405 F.3d at 64 (quoting *Dudley*, 333 F.3d at 305). Accordingly, courts do not grant ADA plaintiffs standing to sue on behalf of all disabled people. Instead, plaintiffs are limited to suing for barriers related to their specific disability. *Medina-Rodriguez v. Canovanas Plaza Rial, Econo Rial, LLC*, 2021 WL 4485652, at *7–8 (D.P.R. Sept. 30, 2021) (dismissing ADA claims after finding plaintiff "has not explained how these issues affected or would affect [him] even if they were in violation of the ADA"). Because Betancourt testified the height of the side grab bar was appropriate for him, he failed to state an injury in fact resulting from this alleged barrier. Accordingly, his claim regarding the height of the side grab bar is **DISMISSED with prejudice**.

### iii.       Side Grab Bar – Distance from Back Wall

As mentioned, Betancourt testified the grab bars were far from where they were supposed to be to facilitate his movement from his wheelchair to the toilet. Dkt. 94 at 70:22–71:3. Though he clarified the height of the side grab bar was appropriate for him, he made no such statement regarding its distance from the wall behind the toilet. Accordingly, he stated an injury in fact regarding that alleged ADA violation.

### iv.       Back Grab Bar – Height

Likewise, though Betancourt stated the side grab bar was an appropriate height for him, he made no such statement regarding the height of the back grab bar located on the wall behind the toilet. He thus stated an injury in fact regarding this alleged ADA violation.

### v.        Mirror

Betancourt established an injury in fact by testifying he could not see himself in the bathroom mirror because it was installed too high. Dkt. 94 at 72:24–73:13.

## 2.  Barriers

### i.        Side Grab Bar – Distance from Back Wall

Grab bars beside a toilet must be located no more than twelve inches from the wall behind a toilet. ADAAG § 604.5.1. This distance is measured from the wall behind the toilet to the center of the circular fixture attaching the grab bar to the side wall. *See id.* Figure 604.5.1. Solís testified the grab bar beside the toilet was located twelve inches from the back wall, Dkt. 94 at 47:16–21, and that distance remains unchanged. *Id.* at 30:14–25. However, he could not remember if he measured this distance from the rear wall to the beginning of the grab bar or from the rear wall to the beginning of the circular fixture anchoring the grab bar to the side wall. *Id.* at 48:23 – 49:5; *see* Dkt. 86 at 29. He nevertheless testified he would normally measure from the back wall to the

beginning of the circular fixture. Dkt. 94 at 49:15–18. Under ADAAG § 604.5.1, that method is incorrect. If the edge, as opposed to the center, of the circular fixture were located 12 inches from the back wall, then the grab bar was incorrectly located. Betancourt's own measurement demonstrates the center of the circular fixture measured more than 13 inches from the back wall. *See* Pl. Ex. 17. Though that measurement was taken on October 20, 2023, Solís testified the side grab bar's distance from the back wall had not changed since his first visit. Dkt. 94 at 30:14–25. Accordingly, Betancourt stated a prima facie claim that the side grab bar was incorrectly located because it was too far from the back wall.

ii.     ***Back Grab Bar – Height***

Grab bars must be installed horizontally and mounted so the top of the gripping surface measures 33 to 36 inches above the floor. ADAAG § 609.4. Solís testified that, as of his initial visit, the grab bars were installed thirty-seven inches from the floor. Dkt. 94 at 15:14–16:2. Accordingly, Betancourt stated a prima facie case that the grab bar behind the toilet violated the ADA because it was installed too high.

iii.     ***Mirror***

Mirrors above sinks or countertops must be installed so the bottom edge of the reflecting surface is located no more than 40 inches above the floor. ADAAG § 603.3. Both parties submitted evidence that the Luquillo McDonald's bathroom mirror was installed so that edge began approximately 43 inches above the floor. *See* Dkt. 86 at 28; Pl. Ex. 12. Thus, Betancourt stated a prima facie claim that the bathroom mirror violated the ADA because it was installed too high.

Accordingly, Betancourt stated a prima facie claim he encountered the following ADA violations at the Luquillo McDonald's: (1) the accessible parking spaces were too narrow; (2) the accessible parking spaces lacked required signs; (3) the aisles adjoining the accessible parking

spaces were too narrow; (4) one adjoining aisle featured an unauthorized change in level; (5) the other adjoining aisle did not connect to the accessible entrance; (6) the sales and service counter was too high; (7) the grab bar beside the toilet was installed too far from the back wall; (8) the grab bar behind the toilet in the bathroom was installed too high; and (9) the bathroom mirror was installed too high.

### III.    Ready Achievability

Arcos Dorados appears to argue Betancourt failed to establish that removing these barriers is readily achievable. Specifically, it contends Betancourt provided no cost-estimates for the repairs he seeks and submitted evidence of an unrelated entity's finances to prove Arcos Dorados's ability bring the Luquillo McDonald's into compliance with the ADA. Dkt. 99 at 25–26, 29. Arcos Dorados cited my ruling at summary judgment stating that, at trial, Betancourt needed to provide a general removal plan and discuss its feasibility bearing in mind both structural concerns and costs. Dkt. 99 at 25–26 (quoting Dkt. 52 at 15). However, as I discussed at summary judgment, this language comes from caselaw discussing a plaintiff's burden to show their proposed alterations are readily achievable as defined by the ADA. Dkt. 52 at 14–15 (explaining this inquiry examines, among other things, the cost of the changes and the financial resources of the premises owner). Thus, though Arcos Dorados never explicitly says so, I assume it argues that Betancourt failed to establish the alterations he seeks are readily achievable.

However, even if this argument was not waived for lack of development, it is a nonstarter. The readily achievable framework applies only to "existing facilities." 42 U.S.C. § 12182(b)(2)(A)(iv). As defined by the ADA, such facilities are "'all or any portion of [its] buildings, structures, sites, complexes, . . . roads, walks, [and] passageways' that were in existence at the time of the ADA's enactment." *Iverson v. City Of Bos.*, 452 F.3d 94, 99 (1st Cir. 2006) (citing

28 C.F.R. § 35.104). By contrast, new constructions are facilities designed and constructed for first occupancy after January 26, 1993. 28 C.F.R. 36.401(a). I discussed this framework at summary judgment because the parties had failed to clarify whether the Luquillo McDonald's was an existing facility or new construction under the ADA. But as discussed, the parties now agree the Luquillo McDonald's was constructed in either 1994 or 1995 and is thus a new construction for purposes of the Act. Dkt. 94 at 33:17–22; 179:2–14. Such facilities must be "readily accessible to and usable by individuals with disabilities." 28 C.F.R. 36.401(a). Whether changes to new constructions are "readily achievable" as the ADA defines that term is irrelevant.

Moreover, even assuming ready achievability were relevant to Betancourt's claim, Arcos Dorados's arguments are not persuasive. The Luquillo McDonald's maintenance and equipment manager, Jorge Geraldo Hurtado Arroyo, and Arcos Dorados's attorney, Lorelly Marcano Reyes, both testified that Arcos Dorados has no financial limitations preventing it from bringing its restaurants into compliance with the ADA. Dkt. 94 at 53:3–24; 58:7–13. Because Arcos Dorados concedes it can afford to make any changes needed to comply with the ADA, Betancourt's failure to provide cost estimates or an accurate picture of Arcos Dorados's finances would not affect the readily achievable analysis even if it were relevant to his claim. Accordingly, neither of these arguments warrant exempting Arcos Dorados from the ADA's requirements.

## IV.    Mootness

Arcos Dorados also makes two mootness arguments. It contends all of Betancourt's claims are now moot because it has since remedied the issues he described. Dkt. 99 at 39–40. And it argues the Luquillo McDonald's is closed for renovation after which it will comply with the ADA. *Id.* at 21–23. Betancourt disagrees on both counts. Dkt. 101 at 23–29. He testified he visited the Luquillo McDonald's on October 20, 2023, three days before I held this trial. Dkt. 94 at 84:18–20;

198:4–6. And at that time, the restaurant was open. Dkt. 94 at 201:2–8. Because Betancourt presented evidence the Luquillo McDonald's remained open as of the date of trial, I examine Arcos Dorados's completed changes to the restaurant and its evidence this facility will comply with the ADA following its ongoing renovation.

### A. Current Compliance

### 1. The Parking Lot

Arcos Dorados argues it has remedied the ADA violations Betancourt initially encountered in its parking lot. It explained it reconfigured the two non-compliant accessible parking spaces into one ADA-compliant space and access aisle, installed required signs, and patched the change in level at the base of the ramp to create a smooth transition. Dkt. 99 at 39–42. Arcos Dorados further notes Solís testified the parking lot complied with the ADA by the last of his three visits. *Id.* Betancourt argues Arcos Dorados failed to substantiate this claim with precise measurements or concrete evidence that the exterior barriers had been remedied. Dkt. 101 at 24–25. He further testified and presented photos showing that, as of his October 2023 visit, construction materials blocked the ramp connecting the accessible parking spaces to the restaurant. *See* Dkt. 94 at 198:4–200:22; Pl. Exs. 1, 3.

### *i. ADA Signage*

I find Betancourt's claim is moot with respect to the absence of ADA signs. Solís testified the reconfigured accessible parking space now features ADA-compliant signage, Dkt. 94 at 38:10–18, and Arcos Dorados presented photos corroborating this assertion. Dkt. 86 at 22, 23. The sign can further be seen in Betancourt's own photo from October 2023. *See* Pl. Ex. 1. Because the accessible parking space now features a sign, an injunction requiring its installation would serve no purpose. "Moreover, recurrence of this violation is highly unlikely given that, to resume the

unlawful conduct, defendants would need to affirmatively remove structural improvements from the property." *Medina Rodriguez v. Canovanas Plaza Rial Econo Rial, LLC*, 2020 WL 3971656, at *4 (D.P.R. July 13, 2020) (collecting cases) (denying issuance of injunction mandating installation of ADA-compliant signs in a parking lot after finding signs had already been installed). Betancourt's claim regarding ADA signage is thus **DISMISSED with prejudice**.

### ii.      *Ramp–Change in Level*

Betancourt's claim is also moot with respect to the unauthorized change in level between the access aisle and the ramp leading to the Luquillo McDonald's entrance. Solís testified the change was remedied because Arcos Dorados applied a patch to create a smooth transition. Dkt. 94 at 152:1–14. Betancourt's own photos appear to confirm this, *see* Pl. Ex. 3, and he does not contest that a patch was applied. Moreover, he offered no evidence or argument that this patch is an inadequate remedy for the change in level he encountered. And as with the ADA sign, it seems unlikely that Arcos Dorados would remove this improvement from its premises. Accordingly, Betancourt's claim regarding the change in level is **DISMISSED with prejudice**.

### iii.      *Width of Parking Space and Access Aisle*

However, I find Arcos Dorados failed to establish mootness regarding the width of the accessible parking space and access aisle. Solís testified both complied with the ADA because the former was widened to eleven feet and that the latter was widened comply with the ADA's requirement. Dkt. 94 at 150:2–17. However, he did not provide a measurement of the access aisle, which, assuming the parking space measures eleven feet wide, must be at least five feet wide to comply with the ADA. ADAAG § §§ 502.2, 502.3.1. Further, as discussed, Solís offered incorrect measurements in his testimony regarding the Luquillo McDonald's bathroom and affirmed the restaurant's counter complied with the ADA when it did not. I am thus reluctant to take him at his

word that the accessible parking space and adjoining access aisle comply with the ADA's width requirements. I note he did not state exactly how he conducted his measurements and whether his method complied with the ADA Guidelines. *See* ADAAG § 502.1 (stating "measurements shall be made from the centerline of the markings"). Further, though the ADA Guidelines do not specify requirements for marking accessible parking spaces and aisles, they state, "it is important that the aisle be clearly marked." Advisory to ADAAG § 502.3.3. Betancourt's evidence shows what appear to be access aisle markings on both sides of the parking space. Pl. Exs. 1, 3. *See* ADAAG § 502.3.4 ("Access aisles shall not overlap the vehicular way."). Additionally, though Arcos Dorados submitted photos of the parking space and aisle, Dkt. 86 at 22, "the court certainly cannot know the exact measurement of th[e] space[] based on a photograph alone." *Medina Rodriguez*, 2020 WL 3971656, at *4. In sum, I do not find that Arcos Dorados met its heavy burden in establishing the parking space and access aisle meet the ADA's width requirements. *See Mangual*, 317 F.3d at 60. Arcos Dorados has thus failed to establish mootness regarding these issues.

### iv.     *Access Aisle Connection to Entrance*

However, Arcos Dorados established mootness regarding Betancourt's allegation that one access aisle did not connect to the Luquillo McDonald's entrance. Solís testified the accessible space was expanded to create only one access aisle, which satisfies the ADA's requirements. *See* ADAAG § 502.2; Dkt. 86 at 22. Betancourt does not contest this. Thus, Arcos Dorados established mootness on this issue, and Betancourt's claim that one access aisle does not connect to the Luquillo McDonald's entrance is **DISMISSED with prejudice**.

### v.     *Construction*

Even assuming Arcos Dorados correctly modified its parking lot to comply with the ADA, it has not shown that "it is absolutely clear the allegedly wrongful behavior could not reasonably

be expected to recur." *Laidlaw*, 528 U.S. at 190. I note Arcos Dorados's argument that at least one court has observed "[t]here is no reason to believe that [a public accommodation] spent considerable time and money to renovate its parking lot only to change it back once this litigation is over." Dkt. 99 at 41 (citing *Hillesheim v. Holiday Stationstores, Inc.*, 903 F.3d 786, 791 (8th Cir. 2018)). While that assumption is normally true, there is evidence Arcos Dorados continues to violate the ADA despite its previous barrier removal. Betancourt testified and presented photos showing that wrongful behavior is *actively reoccurring* because the accessible parking area is currently blocked by construction equipment. Pl. Exs. 1, 3. The Luquillo McDonald's thus violates the ADA because it has no accessible parking space available to disabled patrons. *See* ADAAG § 208.2.

Accordingly, Betancourt's claims are moot with respect to the lack of signage in the accessible parking space, the change in level between one access aisle and the ramp leading to the Luquillo McDonald's entrance, and the other access aisle's failure to connect to an accessible entrance. However, Arcos Dorados failed to establish mootness regarding his claims that the accessible parking spaces were too narrow and the adjoining access aisle was too narrow. Moreover, even if Arcos Dorados established these areas complied with the ADA, they are nevertheless blocked by construction equipment rending them unavailable in violation of the ADA.

## 2. The Counter

Arcos Dorados maintains the counter still measures 37 inches high. Dkt. 94 at 113:2–15. That violates the ADA for the reasons discussed above. Accordingly, Arcos Dorados failed to show Betancourt's claim regarding this barrier was moot.

### 3. The Bathroom

#### i. *Side Grab Bar – Distance from Back Wall*

Betancourt testified he measured the distance between the side grab bar and the wall behind the toilet on October 20, 2023. *Id.* at 202:5–22. Photos from that measurement show the grab bar was located more than 13 inches from the back wall. Pl. Exs. 16, 17. Accordingly, Arcos Dorados failed to show Betancourt's claims were moot with respect to this barrier.

#### ii. *Back Grab Bar – Height*

Solís testified the grab bar located above the back of the toilet had been lowered to comply with the ADA. Dkt. 94 at 24:16–23. Betancourt presented no evidence contradicting this testimony. That bar appears to be located at the same height as the grab bar located to the side of the toilet, which Arcos Dorados lowered to a height of less than 36 inches, Dkt. 86 at 28–29, as Betancourt acknowledged. Dkt. 94 at 93:6–11. Accordingly, Betancourt's claim regarding this barrier is now moot, and this claim is **DISMISSED with prejudice**.

#### iii. *Mirror*

Betancourt measured the bathroom mirror during his October 2023 visit. Dkt. 94 at 201:10–24. His evidence shows the reflective surface of the mirror begins more than 40 inches off the ground. Pl. Ex. 12. Arcos Dorados thus failed to show Betancourt's claim regarding the mirror was moot.

### B. Future Compliance

I next turn to Arcos Dorados's argument that the Luquillo McDonald's is undergoing an extensive renovation after which it will comply with the ADA. Dkt. 99 at 21–23. It cites Marcano's testimony that the facility has always complied with the ADA and that Arcos Dorados has hired multiple experts to ensure compliance. *Id.* at 22. It further submitted planning documents and

attested to the costs incurred so far for that renovation. Dkt. 86 at 35–40; Dkt. 89. However, Marcano's testimony that the Luquillo McDonald's has always complied with the ADA is incorrect for the reasons discussed above. Further, though Arcos Dorados previously hired an expert, Solís, the Luquillo McDonald's still violated the ADA after Arcos Dorados made Solís's recommended changes. Thus, Arcos Dorados's hiring of experts offers no guarantee that it will bring the Luquillo McDonald's into compliance with the ADA this time. Further, while the submitted plans and cost analyses document a seemingly large-scale renovation, they provide no assurance that this project will address the ADA violations Betancourt identified. Though Solís testified plans showed the counter would be lowered to 36 inches, Dkt. 94 at 172:10–17, Arcos Dorados submitted no plans documenting this change. Arcos Dorados itself argued that it undertook the renovation for reasons unrelated to this case, specifically to provide customers "a more innovative experience." Dkt. 99 at 21. Such an assertion exacerbates the concern that the barriers Betancourt identified will persist even following the renovation.

Arcos Dorados argues its renovation moots Betancourt's claims by analogizing the Luquillo McDonald's to the restaurant at issue in *Theodore v. 99 Restaurants, LLC*, 2019 WL 4861201 (D.N.H. Oct. 2, 2019). There, the court found an ADA claim moot "[b]ecause defendants have undertaken substantial, permanent structural renovations to bring [their r]estaurant into compliance with the ADA." *Id.* at *9. However, by the time of the court's ruling in *Theodore*, the improvements had already been completed. *Id.* at *2 (describing changes made). Here by contrast, Arcos Dorados explained the renovations are planned or, at best, ongoing. That status offers far less of a guarantee of future compliance than the completed renovations at issue in *Theodore*. Further, Arcos Dorados already altered the Luquillo McDonald's to comply with the ADA and, following those alterations, the facility nevertheless still violated the Act. Thus, there is no reason

to believe the Luquillo McDonald's will comply with the ADA following its second renovation, especially given Arcos Dorados's assertion it began the renovation for reasons unrelated to this case.

I find that the Luquillo McDonald's is more accurately analogized to the facility at issue in *Simpson v. CHS, Inc.*, 2021 WL 763883 (D. Mont. Feb. 26, 2021). In *Simpson*, a wheelchair-bound patron alleged he encountered numerous ADA violations at a convenience store which responded that the non-compliant features of that store no longer existed because the facility was closed for renovations. *Id.* at *1. The court observed the store's general manager submitted an affidavit that the exterior of the store would comply with the ADA upon reopening, but noted this affidavit did not address the allegedly non-compliant interior of the store. *Id.* It then recounted the magistrate judge's report and recommendation, which concluded as follows:

> [I]t is both unreasonable and highly improbable that [Defendant], after having been served with notice of [Plaintiff]'s lawsuit, would hire an architecture firm to draft plans for remodeling the Premises, submit those plans to the City . . . for approval, obtain a building permit, and undertake an extensive months-long demolition and construction process only to recreate the same wheelchair accessibility barriers that prompted [Plaintiff]'s lawsuit.

*Id.* Nevertheless, the district judge in *Simpson* explicitly rejected that finding and denied the defendant's motion to dismiss noting that the defendant "carries the burden of persuasion" and, based on the record, the court "cannot be 'absolutely' certain that future ADA violations cannot reasonably be expected to reoccur." *Id.* at *4 (citing *Friends of the Earth, Inc.*, 528 U.S. at 189).

The *Simpson* court began its analysis by observing that courts find ADA cases moot for voluntary remediation based on completed work in "relatively rare" circumstances, usually when plaintiffs concede the issue. *Id.* at 3 (collecting cases). It then acknowledged that one court found a defendant's plans for ADA compliant renovations mooted a plaintiff's ADA claim. *Id.* (citing *Access 4 All, Inc. v. Casa Marina Owner, LLC*, 458 F. Supp. 2d 1359, 1365 (S.D. Fla. 2006)). It

observed that owners of the luxury resort at issue in *Access 4 All* hired expert consultants to ensure their renovations would comply with the ADA and invested approximately $38 million in the project. *Id.* Further, it found the remodeling plans "had been approved by the City planning board which specifically conditioned its building permits on ADA compliance for all public lodging facilities." *Id.* After noting *Access 4 All* was dismissed on appeal for undisclosed reasons, the *Simpson* court observed, "*Access 4 All* makes clear that any mootness challenge—even one based on prospective work—must be support [sic] by solid and extensive evidence of ADA compliance." *Id.*

The *Simpson* court found the record before it lacked such evidence. It noted that record included the store manager's affidavit, architecture plans, and building permits. *Id.* at 4. It found that, while the affidavit promised the exterior of the store would comply with the ADA, it made no equivalent assertion regarding the interior. *Id.* It then noted the architectural plans did not mention ADA compliance and the permit was issued based on the plans' compliance with state, not federal, law. *Id.*

Similar issues doom Arcos Dorados's blanket mootness claim. Though Marcano testified the Luquillo McDonald's will comply with the ADA following its renovation, that claim is undercut by her erroneous assertion the facility already complies with the ADA. And though Solís testified the counter would be lowered to 36 inches and the bathrooms would be accessible, he did not address the remaining exterior barriers. Both witnesses' testimony is further weakened by Arcos Dorados's strenuous assertion that it undertook this renovation to "provide all customers a more innovative experience," not to address the issues Betancourt raised in this lawsuit. Dkt. 99 at 21. Further, aside from featuring the accessibility symbol in a parking space, Dkt. 86 at 35–40, as in *Simpson*, Arcos Dorados's "architecture plans themselves contain no mention of ADA

compliance." 2021 WL 763883, at *4. And Arcos Dorados submitted no evidence of a permit nor information about whether it obtained a permit contingent on its plan's ADA compliance. Lastly, though Arcos Dorados submitted a spreadsheet detailing money spent on ADA compliance, that document details the changes made in 2021 and early 2022 that Solís explained in his testimony. *See* Dkt. 89-1. It does not outline money spent for ongoing changes that will bring the Luquillo McDonald's into ADA compliance.

In sum, the only evidence Arcos Dorados submitted that the Luquillo McDonald's will comply with the ADA is the testimony of Solís and Marcano, both of whom erroneously testified that the facility already complied with the ADA. Moreover, Arcos Dorados has forcefully argued it undertook the current renovation for reasons unrelated to this lawsuit. Accordingly, it falls well short of its burden to leave the court "absolutely clear" that it will remedy the remaining ADA violations. *Friends of the Earth, Inc.*, 528 U.S. at 170.

## CONCLUSION

For the above reasons, Betancourt's request for declaratory and injunctive relief is **GRANTED IN PART**. I find that facets of the Luquillo McDonald's parking lot, service counter, and bathroom violated the ADA as outlined above. Thus, Arcos Dorados is ordered to alter the Luquillo McDonald's in accordance with the ADA requirements described above. Specifically, it shall make the following changes:

1. Verify whether the accessible parking space and access aisle comply with the ADAAG § 502.2 requirement that these areas measure either 132 inches and 60 inches wide respectively or that they both measure at least 96 inches wide and, if they do not, alter them as necessary;

2. Remove any access aisle markings within the accessible parking space;

3.  Remove the construction materials blocking the accessible parking space, access aisle, and the pathway between the accessible parking space and the Luquillo McDonald's entrance;

4.  Lower the service counter to comply with the ADA's 36-inch height limit for such counters;

5.  Move the grab bar beside the toilet to comply with the ADA's requirement that the center of the circular fixture connecting such bars to the wall beside the toilet be 12 inches from the wall behind the toilet; and

6.  Lower the bathroom mirror to comply with the ADA's requirement that reflective surfaces begin no higher than 40 inches from the floor.

The balance of Betancourt's claims are **DISMISSED with prejudice**.

**Costs and Attorney's Fees**

Successful ADA plaintiffs may receive "a reasonable attorney's fee, including litigation expenses, and costs." 28 C.F.R. § 36.505. Accordingly, Betancourt may apply for attorneys' fees and litigation costs in accordance with Federal Rule of Civil Procedure 54(d).

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 11th day of January 2024.

> *S/ **Bruce J. McGiverin***
> BRUCE J. McGIVERIN
> United States Magistrate Judge